RUSSELL T. HARSCH, Appellee, v. CHICAGO, ROCK ISLAND & PACIFIC RAILWAY COMPANY, Appellant.

No. 40036.

1378

September 26, 1930.

Rehearing Denied April 10, 1931.

*Sawyer & Norman, J. G. Gamble,* and *F. W. Miller,* for appellant.

*Hollingsworth & Hollingsworth* and *William Z. Hollingsworth,* for appellee.

Evans, J.—From March, 1919, to March, 1924, the plaintiff was a tenant upon a farm of 320 acres, through which the defendant's railroad extended easterly-westerly. 115 acres of  the farm lay on the north side of the right of way, including a pasture of 55 acres. The buildings upon the farm were not far from the right of way. A lane extended from the yards across the right of way to the pasture on the northerly side. A private crossing had been constructed for the use of the farm, pursuant to Section 8011 of the Code, 1927. Gates were constructed in the right-of-way fences on each side of the crossing, and these were opened and closed by the plaintiff night and morning, whenever he drove his live stock through.

On different dates, beginning with June, 1920, and ending with April, 1923, one cattle guard was traversed by plaintiff's horses whereby they suffered injury to their feet. This occurred on five dates, a single horse being involved each time. Each incident occurred in the presence of the plaintiff himself. Plaintiff's action is predicated upon the *unnecessarily* dangerous character of the cattle guard. The specific negligence charged is:

"The said defendant constructed a cattle guard that was *unnecessarily dangerous* to stock, and that was likely to permanently injure stock, and that the said cattle guard consisted of sharp points of metal, projecting upward in such a manner that, if a horse's foot was pressed upon it, it would pierce the frog of such foot and produce a dangerous and permanent injury, and one likely to damage or destroy such animal. That, in adopting the said unnecessarily perilous and dangerous cattle guard, and in maintaining same at the said crossing, the defendant was guilty of negligence."

No other form of negligence is charged. The purport of this charge is that the cattle guard in question would have been sufficiently effective without the severe equipment of sharp prongs thereon, and that, therefore, the sharp prongs were unnecessarily dangerous. The cattle guard was constructed pursuant to Section 8011, which provides as follows:

"8011. *Private crossings.* When any person owns land on both sides of any railway, or when a railway runs parallel with a public highway thereby separating a farm from such highway, the corporation owning or operating such railway, on request of the owner of such land or farm, shall construct and maintain a safe and adequate farm crossing or roadway across such railway and right of way at such reasonable place as the owner of the land may designate, and shall construct and maintain a cattle guard on each side of such roadway where it crosses the track, connected by wing or cross fences to the fences on each side of the right of way."

The argument of the plaintiff here is predicated largely upon Section 8005. It carries the assumption that plaintiff's

rights herein are defined by said Section 8005. Instructions of the court reflect the same assumption. This section is as follows:

"8005. *Failure to fence.* Any corporation operating a railway and failing to fence its right of way against live stock running at large or to maintain proper and sufficient cattle guards at all points where the right to fence or maintain cattle guards exists, shall be liable to the owner of any stock killed or injured by reason of the want of such fence or cattle guards for the full amount of the damages sustained by the owner, unless it was occasioned by the willful act of such owner or his agent; and to recover the same it shall only be necessary for him to prove the loss of or injury to his property."

It should be noted at the outset that this section has no application to plaintiff's alleged cause of action. This section emphasizes the duty of the railroad company to fence and protect its right of way against live stock running at large. It renders the railway company liable for damages to owners of live stock which shall be injured or killed upon the right of way through failure of the railway company to construct and maintain effective fences and cattle guards. The injuries contemplated by this statute are those resulting to live stock by the operation of trains. The case at bar is not a case of that kind. Impliedly, it negatives any want of effectiveness in the cattle guard. The basis of complaint is that it was unnecessarily extreme in its effectiveness. The injury to plaintiff's horses was caused, not by failure of a fence or cattle guard, not because of their escape into the right of way, but because, at the threshold of their entrance, they were injured by the very barrier which had been interposed to prevent their going upon such right of way. If the defendant is liable at all, it became so liable with the first step of the animal and by his contact with the first prong. It became liable, if at all, before the animal crossed the barrier into the right of way. There is no provision of our statute which contemplates damages for injuries resulting from the prongs and dangers of the cattle guard itself. The plaintiff's suit, therefore, must be regarded as a mere common-law action for negligence, which might arise independently of

the statute. The provision of Section 8005 which makes a prima-facie case upon proof of injury alone, has no application thereto whatever.

Plaintiff's argument here is predicated also upon the assumption that Section 8011 requires the defendant to construct and maintain a *"safe* cattle guard." The instructions of the trial court were predicated upon the same assumption. In Instruction 9 the court said:

"The jury are instructed that it was the duty of the defendant and its servants in charge of maintenance of its tracks to see that the cattle guards at the place and time in question where the alleged injuries occurred, were in a reasonably safe condition for the purpose for which they were constructed."

And again, in the same instruction:

"If the jury finds that the defendant's servants in charge of the railway track at the place in question where the cattle guard is located did, under the facts and circumstances disclosed by the evidence, exercise proper care and diligence under the law as defined in the instructions given you by the court, in seeing that the said cattle guards were in reasonably *safe* and proper condition for the purposes for which they were constructed, then the plaintiff cannot recover in this case, and your verdict should be in favor of the defendant."

By the foregoing instruction, the trial court not only imposed upon the defendant the duty to maintain a *safe* cattle guard, but imposed upon it also the burden of proving that its cattle guard was *safe*. Safe for whom? Safe for what?

Section 8011 imposes upon the railroad company the duty to construct and maintain "a safe and adequate *farm crossing or roadway* across such railway." The same section requires the construction and maintenance of "a cattle guard." The attribute of *safety* is not therein attached to the cattle guard. A cattle guard is, of necessity, inherently dangerous in substantial degree. The plaintiff's petition so implies, in predicating its allegation of negligence, not upon the fact that the cattle guard was *dangerous,* but that it was *unnecessarily* so.

With these preliminary observations, we proceed to a consideration of the fundamentals of the case.

I. We have set forth above the allegations of negligence contained in the petition. It will be noted that they consist largely of mere legal conclusion. For the purpose of the discussion at this point, we shall assume them to be sufficient to tender an issue, and assume likewise that the negligence charged is actionable. The allegation was that the cattle guard was *unnecessarily* dangerous. Did the plaintiff produce sufficient evidence to warrant the jury in sustaining such allegation? The burden was upon the plaintiff, not simply to prove that the cattle guard was dangerous, but that it was *unnecessarily* so.

From the beginning of the railroad era, the cattle guard has been a problem of engineering invention. It is a part of the plan of fencing a railroad right of way against all encroachments. The problem was to devise and to create between the rails of the railway company a barrier against the ingress of live stock into the right of way, and yet one which would not be a barrier to the passing of a train over the same space. If the space between the rails were left unguarded, it would render possible the ingress of animals on the right of way. If a fence were erected across such space, it would stop the trains. The ingenuity of the inventor was necessarily directed, therefore, to some contrivance which should interfere effectively with the travel of animals between such rails. Many devices, differing in detail, have been used. The adequacy of the best of them (if there be such) is approximate and comparative. All of them interpose some form of danger, which is made obvious to the approaching animal immediately upon his attempt to pass over the space. The most common form of danger adopted is the sharp point or prong, the purpose and tendency of which is to restrain or discourage the animal at the very first step. The statute does not attempt to define the type or plan of the cattle guard. It does lay upon the corporation the duty to construct one on some plan which shall be reasonably adequate to prevent live stock from entering upon the right of way. The protection of live stock is only the secondary objective of this statutory restraint, and not the primary one, as plaintiff assumes. The primary objective is the protection of trains and the human life committed to their keeping. Wherever fences may properly be erected, the statute provides the types thereof. But the types of cattle guards are left by the statute to the progressive in-

genuity of inventor and engineer. Danger to the animal has been the basic idea of every cattle guard that has been described in this record.

It appears from the undisputed evidence in this record that the type of cattle guard in question has been used for many years by this defendant and by many others of the larger railroads of the country, and that it has had the universal approval of the engineering departments of substantially all railways in the country. This is met by the plaintiff only with the showing that there are other types of cattle guards in use by other railroads. There is no showing that such types are less dangerous than the one used by the defendant. On the contrary, it appears that nearly all of them carry substantially the same prongs that are complained of herein. There is some claim that the old types in use 40 or more years ago are still in use to some extent, and that they are less dangerous than the present type. Two of the types thus specified by plaintiff are described in *Timins v. Chicago, R. I. & P. R. Co.*, 72 Iowa 94, and *Campbell v. Iowa Cent. R. Co.*, 124 Iowa 248. In those cases, these types were held to be an inadequate compliance with the statute, and damages were allowed the complaining parties, under the provisions of Section 8005. Under the holdings in those cases, it was incumbent upon the railway companies to increase the effectiveness of their cattle guards and to change the existing types accordingly.

We find nothing in plaintiff's evidence which impeaches in any degree the type of cattle guard in use by this defendant, nor any evidence that would sustain a finding that there is any type of cattle guard in use which would be equally effective as, and yet less dangerous than, the type now in use. A verdict for the defendant should, therefore, have been directed.

II. We may further inquire whether the fact that a cattle guard is dangerous, either in greater or less degree, constitutes a violation of the statute, either in letter or in spirit.

In the present state of knowledge and invention, as it is disclosed in this record, no cattle guard can be made effective without presenting a measure of danger to the encroaching animal. The effectiveness of a cattle guard is, of necessity, accomplished indirectly, and not directly. That is to say, no strength of material is interposed against the ingress of the

animal. The utmost that can be accomplished directly by the cattle guard is to prick the feet of the animal. With the great mass of live stock, this ordeal is sufficient to turn the animal back. If the exceptional animal ignores the pricking of its feet and proceeds upon its course, it thereby exhausts the effectiveness of the cattle guard, and finds itself unopposed by any other obstacle.

· Does the policy of the statute frown upon such indirect method of guarding the right of way against the encroachments of live stock? Section 8003 furnishes us some guide, by way of analogy, to the spirit of the statute in this respect. This section specifies the approved types of fences for inclosing the right of way. The first type specified is: "Not less than five *barbed wires.*" Why *barbed* wire? A barb upon the wire adds no strength thereto. The resisting power of a wire, as against the strength of an animal, is no stronger with a *barb* than without it. But the virtue of the barb is its prong, and its sole function is to threaten danger to the encroaching animal, and to inflict it if the threat be ineffective. The effectiveness of the barbed wire is indirect in like manner as is the effectiveness of the pronged cattle guard. The animal shrinks from barb and prong, and escapes harm by withdrawing therefrom. It is true, nevertheless, that a barbed wire is potentially quite dangerous, and that it actually inflicts great injury in the exceptional case. It sometimes cuts deeply into horse flesh, and sometimes destroys the udder of a valuable cow. But the practical fact is that, in the great body of experience, the potential danger of barbed wire remains potential only, and the threatened injury thereof is avoided by the obedience of the animal.

· If, in lieu of the present type of cattle guard, the railway corporation had laid a floor of barbed wire upon the space between its rails, the barbs would carry the same potential danger that they would upon the fence. In that sense the barbs would be dangerous. Their use, however, would be consistent with the express provisions of the statute.

· In the same sense, the prong of the cattle guard is potentially dangerous. In the main, however, it becomes effective indirectly to stop the encroachment of the animal without actual infliction of injury. In the exceptional case, where the animal disregards the warning prong, the potential danger necessarily

becomes an actuality, and some degree of injury must result.

The indirect effectiveness of the prong is well illustrated by the evidence in this record. The plaintiff had upon this farm approximately 40 head of live stock, which he drove between these cattle guards twice a day for five years. Each day's total of crossings by animals was 80 in number. In the course of one year, these totals would rise into the tens of thousands, and in five years would exceed a hundred thousand. These thousands of crossings between these cattle guards were accomplished indirectly as effectively as if the wing fences had been extended across the space. More than one hundred thousand times did these animals obey the warning of the prong. As against this vast volume of practical, though indirect, success, five instances occurred where the prong, with its threat of danger, was disregarded, and the threatened injury was necessarily inflicted. Manifestly, here was a demonstration of a very large success. That there should be an occasional exception to all success is inevitable in practical experience.

We deem it clear that the cattle guard in question conformed to the letter and spirit of the statute, and that the element of danger involved in it was a necessity to its practical operation. It follows that no cause of action was stated by the allegations of the petition. The net result of our consideration is that the plaintiff's alleged cause of action has no support, either of statute or of precedent.

We hold: (1) The plaintiff failed to prove that the danger presented by this guard was unnecessary; (2) danger of injury to an animal passing over it is a necessary attribute of a cattle guard, and as such, is not actionable.

The judgment below, is, accordingly, reversed.—*Reversed*.

FAVILLE, DE GRAFF, ALBERT, WAGNER, and GRIMM, JJ., concur.

MORLING, C. J. (dissenting)—I think the case was for the jury. It is, of course, obvious that the problem of constructing and maintaining an effective, and still not unduly dangerous, cattle guard is a very difficult one to solve. The company has the right to use all necessary means the use of which does not transgress its duty of exercising ordinary care to keep cattle off its right of way. It owes in this respect a duty to its pas-

sengers and the owners of freight carried by it. It also owes, however, a duty to the landowner and to the owner of stock. Probably the statutory requirement that railroad companies fence their right of way resulted as much from the interest of the landowners and the owners of stock as from any other. Live stock is valuable property. Domestic animals have their well-known natural proclivities and instincts. The owners have the right to transfer them from one side of the railroad to the other, by public or private crossing. The railroad company surely owes a duty to exercise reasonable care toward live stock and its owners in the performance of its statutory duties to construct and maintain cattle guards. The evidence in this case is that the plaintiff was occupying the farm in controversy from 1919 to 1923, and during that time this plaintiff thinks he never had over 11, and never less than 7, horses; that he kept, not 40 head of cattle, but 12 to 40 head of animals, in the "pasture north of the tracks. There were not 40 head of animals in this pasture when all the accidents to my horses occurred. There was about that number of animals in the pasture when the last ones were hurt. * * * In every case except one, I was personally driving the stock over the crossing at the time the accident happened. * * * When the last ones were hurt, * * * Coop was driving them. * * * The animals just apparently took a notion to go down the tracks. Different horses walked across the cattle guards each time." In these years, 1919 to 1923, according to plaintiff's testimony:

"I had a number of horses injured on these cattle guards. I had a number of them crippled that didn't have to be cared for. I think there were about seven that caused me considerable trouble. 'There was more than that that I had in that time, and the same way with cattle. I had a number of cattle crippled, but it didn't affect them like it did the horses.' "

Plaintiff had a horse injured in June, 1920. In November, 1921, another received injuries which resulted in death. Another in January, 1922, and two in April, 1923, were injured. In all these cases the foot became infected, so that a veterinarian was called. A later occupant says he had five horses injured there. The testimony is that the cattle guards in question "were made of metal strips laid between the rails and on each side

of the rail. * * * nailed to the ties, and the bottom of the strips were flush with the ground. * * * These strips of metal were about eight feet long, I should judge, and were laid lengthwise [parallel] to the rail. * * * These metal strips were perforated with triangular perforations, and the metal triangle was bent, to form a right angle with the metal strip. These metal points stuck up all along each of the strips to within a few inches of each end. These metal strips were about three inches apart. * * * The metal points * *.* are two and one-eighth inches high. The metal strips on the outside of each rail were higher than the strips between the rails. * * * Grass would grow up between these metal strips. * * * I would judge these strips of metal projected beyond the fences about five and one-half feet. * * * The metal strips which composed the cattle guard were about one sixteenth of an inch thick * * * not painted * * * rusty looking * * * The general color of the guards is about the same as the railroad tracks. * * * The prongs were visible if you looked close enough. The prongs extended upward a distance of a little over two inches. As a rule they were filled with grass, so you couldn't possibly see unless you looked pretty close,— only small spots of the guards were visible. * * * That part of the guard on the outside of the rails was visible * * * The grass that was in the guards in January was dead stuff that had grown up previously.'' Another witness testifies: ''The prongs run into the horse's foot an inch and a half.'' The faces of the triangular strips were parallel with the rails, so that the edges would be presented to an animal approaching the cattle guard.

While there is testimony in general terms that these guards are in general use, yet defendant's roadmaster testifies:

''I have seen cattle guards made of sheet iron, with prongs not as sharp as the Cook guard, and set so that it faces approaching the stock when they come down along the tracks. Instead of the edge facing the stock, the broad side of the prong faces the stock. This type of guard is not made in strips, but in sheets.'' The road master testifies: ''The effectiveness of the Cook guard [that in question] lies in the fact it appeals to the animal's sense of feeling, to deter it from walking over the guard. * * * My idea of the effectiveness of the Cook guard is that it appeals to the horse's sense of feeling. It runs into the horse's foot and gives it pain when it tries to cross.''

1388

The section foreman says:

"Mr. Sargent asked me to take the guard up, and I wrote to the company about that. I have had some complaints of injury from these Cook guards. Mr. Harsch, Mr. Lee, and Mr. Meek have complained."

Defendant's division engineer says:

"The American Railway Engineering Association passed a resolution approving the Cook type of cattle guard, and also approving other types of guard. * * * There are some roads that do not use the Cook guard. * * * The Cook guard, if torn up, would probably not derail the train, because the strip is of light weight. It is about an eighth or three sixteenth of an inch thick. * * * The Sheffields are heavier stuff. When a train is in good running order, nothing should be dragging; but chains break loose, and riggings sometimes gets down a little too low. * * * Recently the Burlington have been making cattle guards out of old boiler flues. They take a piece of pipe, flatten it out, and then bend it into a ridge, so that it makes a triangular 'piece sticking up.' These pipes are placed so that the centers are five or six inches apart. * * * There are a good many roads in Iowa,—it seems to me 27 or 28 * * * The only Iowa roads that I know about, using the Cook strip, are the Milwaukee, Illinois Central, Burlington, and Rock Island. The Northwestern."

The divisional engineer says that the Sheffield guard has the disadvantage that, when the brake rigging or something is dragging, it will pick up the cattle guard, and is liable to get under the wheels and cause derailment; that there is not enough metal in one Cook strip to cause derailment, and if one is torn loose, it does not leave the cattle guard unprotected.

The purpose of the cattle guard is not to punish the animal for venturing upon it, but to repel or deter from crossing it. It seems to me that the rows of prongs might be found to present the appearance of steel-hued streaks in the grass, and cinders, more or less broken and confusing, and that they would not ordinarily impress the animal's sense of sight as prongs or blades painful to step upon; that the cattle guard would not impress the animal through the sense of sight as dangerous or

painful, and that its appearance would not be repelling or deterring; that the sense of feeling and of hurt would naturally and ordinarily be sustained by placing the animal's weight upon the prongs and the consequent dangerous penetration of the foot.

Many animals driven over the crossing would cross directly. It would be the few that would diverge and, from fright or curiosity, attempt to cross the cattle guard. The fact that many animals go over the crossing without injury is of no consequence. (*Bryce v. Chicago, M. & St. P. R. Co.*, 103 Iowa 665.)

Complaints concerning the guards were made to defendant.

The testimony of the defendant's roadmaster shows that the prongs were known and intended not merely to prick, but to run into the horse's foot. On the evidence, the prong was adapted to penetrate, and would penetrate, to the depth of an inch and a half. The foot, from the bacteria which it picks up, and from the bacteria on the prongs, is peculiarly susceptible to infection, which by these prongs would be carried into the foot to the depth of an inch and a half. It seems to me that a reasonable mind might find, on this evidence, that the prongs of the cattle guard are adapted, not merely to deter or repel, but to inflict a grievous, punitive, and otherwise purposeless injury, and not merely a deterrent pain; adapted uselessly to inflict injury and damage, and not to repel or deter.

Horses are easily and frequently startled into running, and taking a seemingly open and unobstructed course. Their natural instincts are to forage, to stray through apparently open places, to indulge mere curiosity. It might, on this record, be found to be a fact that a horse frightened into running along the railroad, or tempted by the prospect of feed, or following its inherent proclivities and instincts, might reasonably be expected to attempt to pass over the cattle guards, and in doing so, frequently and ordinarily to step upon the prongs with such force, or under such weight, as to force the prongs to pierce the soft tissue of the foot to the depth stated. It might be found that, with its foot on the sharp prongs, the inertia of the animal, or speed or fright, or its instincts, would ordinarily carry it forward, rather than repel or deter it. It might be found that the construction of these cattle guards was such as to produce, not merely a repelling pain from an inconsequential hurt, but a

cruel and useless injury,—not, in practical operation or design, effective to merely deter or repel, but to invite. It might be found that the cattle guard was dangerous to such degree as to transcend the limits of reasonable care.

One obvious purpose of requiring the fencing of railroad right of ways and the maintenance of cattle guards is to prevent live stock from straying, and particularly from getting upon the right of way, thereby imperiling themselves and the operation of trains, to the damage of their owners and of the company and its property, passengers and freight. See 2 Cooley on Torts (3rd Ed.) 1402. Protection of the live stock itself is one of these purposes. This would be defeated by the use of a guard dangerous to an unreasonable, excessive, and useless degree. Some animals, in obedience to natural instinct, and from fright, will attempt to pass over the guard. There are perils attendant upon such an attempt that are unavoidable, notwithstanding the exercise of reasonable care. As defendant argues, absolute prevention of animals from crossing the cattle guards is, at the present time, unattainable. The construction and maintenance of the guard are not actionable merely because it is dangerous to stock in passing over it. It does not follow, however, that the railway company may, with impunity, maintain a cattle guard that is, in its very construction, adapted not merely to repelling or deterring stock, but to inflicting upon them a wound dangerous to a useless and unreasonable degree. The company must exercise a degree of care proportionate to its statutory and common-law duties toward all concerned. Reasonable care is the standard. Neither the statutes nor the common law give the company the right, in the performance of its statutory duty, to maintain cattle guards that are intrinsically and unreasonably cruel, or that will unreasonably imperil animals which are attempting, in following out their natural proclivities and instincts, to pass over them.

The fact that other companies, or that engineering societies, approve of a guard of such a character as to be unreasonably inimical to the safety of straying animals does not absolve the companies or the defendant from liability for negligence. The company may have exercised a degree of care that, with respect to its own rights, is greater than is demanded of it, and yet be negligent with respect to stock and its owner. The defendant

was under statutory duty to maintain a cattle guard reasonably adapted to repelling animals from its right of way or deterring them from entering upon it; but it was under no duty, and had no right, to construct a cattle guard unreasonably dangerous to animals attempting to pass over it. Whether the cattle guard in question was unreasonably dangerous to such animals, whether defendant, in the performance of its duties to the public and to the owners of live stock, exercised reasonable and ordinary care in the selection and maintenance of the type of guard in question, I think was, on the record, a' question for the jury.

I think a new trial should be granted for error in the instructions, particularly in not submitting to the jury the question of contributory negligence. It is unnecessary to discuss this proposition. Justice Kindig joins in this dissent.